The scope of complainants’ bill is to restrain defendants, by perpetual injunction, from selling the house and lot therein mentioned, for the debts due by their J ames J acks. Complainants claim the premises as their property by the gift of their father, whilst in prosperous circumstances, and not being made with an intent to defraud his creditors. Defendants in their answer, deny that Jacks was in easy circumstances when the gift or purchase was made, but largely indebted ; that it was made in complainants’ name, to secure the property to them ; that it was fraudulent and intended to defeat his creditors.
The principal question in this case is whether the conveyance to complainants of the lot in bill mentioned, is to be considered as a voluntary conveyance from the father, and made with an intent to defraud his creditors. Iq order to form a correct view of the case, I must advert to the evidence which has been adduced, to see what was the situation and circumstances of Jacks at the time *2 tills deed was executed, and from thence draw the coil* elusion, whether the transaction was or was not fraudulent. The first piece of evidence was the titles to complainants of the lot, dated 6th Feb. 1797 ; which were recorded on the 18th Feb. of the same month and year. Mr. James Scott was then examined for complainants, who swears that Jacks came here in 1784, was a watchmaker, an industrious man, and an economist: he was intimately acquainted with him till the year 1796. Ho was so prosperous that in 1791 he went to England, and brought out a cargo of jewelry, and acquired a considerable property clear of debt; he met with no losses of consequence j that he would have known it if he had, being very intimate with him, and had reference to his books. His credit was very good ■, he imported goods, seldom less than 30001. per annum. That he went to England in the spring of 1796 ; previous to which he took an account of his stock, and it amounted to upwards of 40001. first cost, on the top of the last page of the book without striking the balance. That he was surprised so much stock should be contained in so small a compass. Jacks then told him a quantity of the large articles had been lately sold off, and there was at least 20001. due him in debts; that when Jacks went to England, ho carried with him about 20001. more than would pay all his debts •, (in this witness however was mistaken, for he owed some debts there to the amount of about 22001.) that Jacks left his store and goods with Gibson to sell during his absence. That in the fall of 1796, Jacks brought out a cargo worth 4 times as much as any previous one. He considered Jacks a man of property, worth in the spring of 1797, 7 or 80001. clear of debt, when he purchased the lot; that Jacks told him of his intention to purchase. The bank was established in 1791. Witness was Jacks’ principal endorser till he went to England in 1796 — he was not much indebted to the bank — witness was never called upon to pay any of Jacks’ notes. His debts in bank were not occasioned by what he owed previous to his going to England. *3 Witness never endorsed Jacks’ notes after bis return. J. M. Davis was Ms endorser afterwards, till Ms bankruptcy. When Jacks went to England, his wife’s property was worth 2000Í. and was mingled with his : it was reduced by compromise to 1000L In March, 1797, Jacks went to settle in Philadelphia and returned here in the fall of 1798. He told witness, Gibson was much pressed to make payment at the hanks. Witness understood Jacks was much pressed botli in Philadelphia and Charleston for the goods he had brought out, though he had made considerable remittances in bills, &c. Opposed to this testimony, is that of Mr. Patterson, on the part of the defendants, who had been retained as an assistant to the master, in a case between Gibson and Jacks, and he had access to the co-partnership books, but knew nothing of Jacks’ books. Mr. Patterson produced a statement of the debts due by Jacks .& co. by which it appears that in Feb. 1797, the debts due by Jacks & co. amounted to about 190001, The stock of goods in Charleston and those carried by Jacks to Philadelphia, with the lot and furniture, also, monies received by Gibson on .Jacks’ account for debts and goods sold (2805l. 14s. 8d.) amounted to about 18,7301. somewhat less than what he owed j but upon adding some advance on goods carried to Philadelphia, which it is contended was omitted, and other sums on account of furniture, &c.; the balance will then be some hundred pounds in favor of Jacks.. A great number of letters from Jacks to Gibson, and from Gibson to Jacks were read from which it appears that shortly after Jacks went to Philadelphia, his difficulties commenced : sometimes his affairs were in a prosperous way, but he was more or less embarrassed from 1797 to 1800, and finally became a bankrupt. The causes of his embarrassment are mentioned in these letters; particularly the situation of public affairs; the new loan effected by government which occasioned a scarcity of money; the yellow fever j Ms building a large house in Philadelphia; the removal of congress from that place, and the consequent fall ip *4 the value of property. In the statement of Ms affairs which he gave to the commissioners of bankruptcy, he has also enumerated a variety of losses, which he sustained. All those causes combined, tend to shew that had they not occurred he would have been in very good circumstances. The certificate of the commissioners of bankruptcy, and the consent of his creditors to his discharge, (of whom the defendant J. M. Davis was one, Andrew Gow, since deceased another) were read by which he is discharged from all his debts then due or owing by him. From the whole of the evidence it is plain that Jacks’ conduct was perfectly free from any apparent intention to deceive or defraud his creditors : a strong proof of it, is Ms recording the titles to the lot immediately after they were executed ; from that circumstance he evinced a perfect conviction in his own mind that he was competent to do the act; and Mr. Scott’s testimony corroborated it, when he says, he thought Jacks was worth 7 or 80001. clear of debt; also that Jacks acquainted him with the purchase. It is likewise more than probable that the defendant Davis was privy to the purchase, as he continued Jacks principal endorser, long after the house was built, and even till Jacks’ bankruptcy.
Mr. Scott in his testimony says that when Jacks went to England in the spring of 3 796, he left a stock of goods of upwards of 40001. value, to be sold by Gibson, besides 20001. of debts to be received. There is no evidence to shew what became of the goods ,• they are not included in the 14.2001. for in the account of stock taken in May 1797, they are said to be the goods imported in the fall of 1796. There is a chasm therefore in this part of the evidence. If those goods were accounted for, the balance would be very considerable in favor of Jacks. With respect to the law on the subject, how far voluntary conveyances for the benefit of a wife and children should bo valid or not, when creditors are concerned, the determinations are various as to the quantum in which a person must be indebted to make the act fraudu *5 lent and the last case fixes it to insolvency. I am not for fixingitto so late aperiod. There is also a difference of opinion as to pre-existing and subsequent debts;. whether the latter are to have any influence. That must I think in a great measure depend upon circumstances $ and our local circumstances make it frequently necessary to differ from foreign adjudications. Suppose for instance a person in this state being indebted, though to a considerable amount, is possessed of a large estate in houses in the city, gives a small part of that property to his child, or children or one similarly circumstanced and indebted, possessed of a considerable estate in lands and negroes, gives a few negroes and some land to his children, and either the accident of fire in the city, or the death of negroes, should reduce his estate so considerably as .to occasion his insolvency, would this court under such circumstances, merely because the person was largely indebted at the time of the gift, consider such gift as fraudulent and set them aside, because creditors were interested. I should apprehend not. Must there be one law then for the land holder and another for the merchant or trader ? Fraud or the intention to defraud is the object of the law, and which it means to guard against: not accidents which perhaps it is not in human foresight to prevent. The fraudulent intent is to be collected, from the magnitude and value of the gift; and surely no one will say that a gift of 700Z. to two daughters, when the father was believed to be worth 7 or 8000Í. in prosperous circumstances, and very high credit, could possibly be considered as an extravagant donation. It was urged as a circumstance or badge of fraud, that Jacks remained in possession of the house, returned it as his property and offered to mortgage it. In this case possession and payment of taxes cannot be considered as badges of fraud, for the complainants were infants of tender years, and therefore incapable of taking charge of the property; and as to his offer to mortgage, if that proves any thing, it proves the honesty of the man, who was willing to secure *6 his expeditors, as far as it was in his power. Although j j0 noj. tliinlc there is any evidence whatever of an intent on the part of Jacks to deceive or defraud his creditors, I should nevertheless have directed an issue to take the sense of a jury on the question of fraudulent intent, if my mind had not been fully satisfied that the consent of the creditors (two of whom are defendants in this suit) to his discharge, and the certificate of the commissioners of bankruptcy had put an end to the question ; for upon considering the various clauses of the bankrupt law, it is plain, that the commissioners of bankruptcy (two of whom are professional men) were fully competent to enquire into this transaction, and if they omitted to do so, any of the creditors might have instituted an enquiry, and if they had entertained any doubt as to the fairness of the business, they might and certainly would have ' had the fact of fraudulent intent tried by a jury : not having done it, I must presume they did not consider the transaction fraudulent, and therefore decree for the complainants, and that each party do pay their own costs.
[There was no appeal from this decree.]